RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATHAN ROBERTS; FREEDOM TRUCK DISPATCH, LLC,
on behalf of themselves and all others similarly
situated,

        *Plaintiffs-Appellants,*

        *v.*

PROGRESSIVE PREFERRED INSURANCE COMPANY;
PROGRESSIVE CASUALTY INSURANCE COMPANY;
CIRCULAR BOARD INC., originally named as Circular
Board, LLC,

        *Defendants-Appellees.*

> No. 24-3454

_____

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:23-cv-01597—Patricia A. Gaughan, District Judge.

Argued:  July 24, 2025

Decided and Filed:  February 24, 2026

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benjamin M. Flowers, ASHBROOK BYRNE KRESGE FLOWERS LLC,
Cincinnati, Ohio, for Appellants.  Stephanie Schuster, MORGAN, LEWIS & BOCKIUS LLP,
Washington, D.C., for the Progressive Appellees.  Neal Kumar Katyal, MILBANK LLP,
Washington, D.C., for Appellee Circular Board Inc.  **ON BRIEF:**  Benjamin M. Flowers, Joseph
P. Ashbrook, Julie E. Byrne, ASHBROOK BYRNE KRESGE FLOWERS LLC, Cincinnati,
Ohio, Jonathan F. Mitchell, MITCHELL LAW PLLC, Austin, Texas, Gene P. Hamilton,
Nicholas R. Barry, AMERICA FIRST LEGAL FOUNDATION, Washington, D.C., for
Appellants.  Stephanie Schuster, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for
the Progressive Appellees.  Neal Kumar Katyal, David M. Foster, Reedy C. Swanson, HOGAN
LOVELLS US LLP, Washington, D.C., for Appellee Circular Board Inc.  William A. Jacobson,
EQUAL PROTECTION PROJECT OF THE LEGAL INSURRECTION FOUNDATION,

Barrington, Rhode Island, Keith Harrison, CROWELL & MORING LLP, Washington, D.C., for Amici Curiae.

MATHIS, J., delivered the opinion of the court in which McKEAGUE, J., concurred. BOGGS, J. (pp. 13–26), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

MATHIS, Circuit Judge.   Progressive Preferred Insurance Company and Progressive Casualty Insurance Company (collectively, "Progressive") partnered with Circular Board Inc. to administer a grant program.   Through that program, they offered $25,000 grants to ten small businesses to help them buy a commercial vehicle.   Like most grants, the program had a few eligibility requirements.   One was that the small business had to be black owned and operated.

Nathan Roberts, who is white, learned about the program and started filling out an online application.   But he never applied.   He closed the application without submitting it after learning that only black-owned businesses could receive the grants.   A few months later, Roberts and his company, Freedom Truck Dispatch LLC (collectively, "Roberts"), filed a putative class-action complaint against Progressive and Circular Board for racially discriminatory grantmaking under 42 U.S.C. § 1981.   He sought damages and injunctive relief.

The district court dismissed the complaint for lack of subject-matter jurisdiction.   Roberts now appeals the dismissal of his damages claims only.   Because Roberts has failed to show that he has standing to sue Progressive and Circular Board, we affirm.

**I.**

Nathan Roberts owns and operates a commercial trucking business, Freedom Truck Dispatch LLC.   In late 2022, Roberts bought a commercial insurance policy from Progressive

Preferred Insurance Company.**1**   Then in 2023, Progressive partnered with Circular Board to administer Progressive's Driving Small Business Forward Fund grant program.

Through the grant program, Progressive offered ten $25,000 grants to black-owned small businesses to help with the purchase of a commercial vehicle.  Progressive identified several eligibility requirements.   Those requirements included: (1) being a black-owned business; (2) having ten or fewer employees and grossing less than $5 million annually; (3) showing a need for a commercial vehicle for the business; and (4) not being in the rideshare or food-delivery business.  To apply, interested businesses completed an online application.

In May 2023, Progressive emailed Roberts an advertisement for the grant program.  Roberts opened the grant application and began completing it.  Then he realized that only black-owned businesses were eligible for the grants.   Because he is white, Roberts closed the application without submitting it.

Roberts asserted that he was "able and ready to apply" for the grant and that his company "satisfied all of the purported eligibility requirements except for the requirement that the applicant be a black-owned business."  R. 32, PageID 267 (quotation omitted).  The complaint also stated that "[o]n information and belief," Defendants did not enforce any of the eligibility requirements besides "the black-owned business criterion."  *Id.* at 266.

Two months after the application deadline for the grant, Roberts sued Progressive and Circular Board, under 42 U.S.C. § 1981, individually and on behalf of a putative class of others who were able and ready to apply for the grant program and "have been or would be subjected to racial discrimination."  *Id.* at 268.  Roberts asserted that Progressive and Circular Board injured him by refusing to enter into "two, sequential contractual agreements" with him because of his race: (1) "the contract to compete for the grant money"—the application-stage contract, and (2) "the subsequent contract connected to receipt of the grant money"—the grant-stage contract. *Id.* at 262, 267, 270.  Roberts sought declaratory and injunctive relief, as well as nominal, compensatory, and punitive damages.

---

**1**Roberts sued both Progressive Preferred Insurance Company and Progressive Casualty Insurance Company.  Because most of Roberts's allegations fail to distinguish between the two, we treat them the same for purposes of this appeal.

The complaint describes the application-stage and grant-stage contracts.  Starting with the application-stage contract, the complaint alleges that "[i]n exchange for being allowed to compete for the grant, applicants agreed to certain terms and conditions that," to their detriment, "provide[d] benefits to" Progressive and Circular Board.  *Id.* at 266.  For example, applicants gave Progressive and Circular Board access to their information and data "for cross-selling and other marketing purposes."  *Id.*  As for the grant-stage contract, the complaint alleges that after Progressive and Circular Board reviewed the applications, they would enter into contracts with the grant winners.  This grant-stage contract required, "[i]n addition to other various benefits and detriments, [that] grant recipients . . . use the money toward the purchase of a commercial vehicle."  *Id.*

Progressive and Circular Board moved to dismiss Roberts's complaint in part for lack of subject-matter jurisdiction.  The district court concluded that Roberts lacked standing and dismissed the case.  The court then entered judgment "in favor of all defendants."

On appeal, Roberts challenges only the dismissal of his damages claims.  He also argues that the district court erred by entering judgment for Progressive and Circular Board after concluding that it lacked subject-matter jurisdiction.

**II.**

The district court dismissed Roberts's complaint for lack of subject-matter jurisdiction.  We review that decision de novo.  *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 350 (6th Cir. 2024).

Parties can contest subject-matter jurisdiction through either a facial or factual attack.  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).  A facial attack challenges "the sufficiency of the pleading itself."  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  Put another way, "[a] party raising a facial challenge argues that a complaint does not adequately plead standing even accepting its facts as true."  *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021).

"A *factual* attack, on the other hand," challenges not "the sufficiency of the pleading's allegations, but . . . the factual existence of subject matter jurisdiction." *Ritchie*, 15 F.3d at 598. Under a factual attack, "the court does not presume that the plaintiff's factual allegations are true." *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015). Instead, the court "weigh[s] evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Carrier Corp.*, 673 F.3d at 440.

Progressive and Circular Board did not challenge the factual predicate of Roberts's damages claim. Instead, they argued that the allegations themselves fell short. So the district court treated their motions to dismiss as facial challenges. We do the same. *See Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014).

## III.

Federal courts have the "judicial Power" to decide "Cases" and "Controversies." U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than" Article III's case-or-controversy requirement. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation modified). This requirement demands that cases "embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020).

To that end, plaintiffs must establish that they have standing to sue before courts can consider the merits of their claims. *Raines v. Byrd*, 521 U.S. 811, 820 (1997). Standing requires that the plaintiff "have a personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). To make this showing, Roberts must establish (1) he suffered an injury in fact (2) that was caused by, or is fairly traceable to, Progressive and Circular Board, and (3) that can be redressed by damages from Progressive and Circular Board.[2] *See Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

---

[2]Roberts seeks to sue on behalf of himself and a class of similarly situated individuals. "Class representatives must prove their own case or controversy with the defendants in order to seek relief for any other member of the class." *Fox v. Saginaw County*, 67 F.4th 284, 294 (6th Cir. 2023) (citation modified). We therefore focus on whether Roberts has standing to sue.

hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified). Causation requires that the identified injury "be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (citation modified). And redressability means that it is "likely," not "merely speculative," that "a favorable decision" will remedy the injury. *Id.* at 561 (citation modified).

Roberts, as the party invoking federal jurisdiction, bears the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). He must do so "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Because the district court dismissed this case at the pleading stage, Roberts needed to "clearly allege facts demonstrating" standing. *Spokeo*, 578 U.S. at 338 (citation modified). This required Roberts's complaint to state a "plausible claim" that he has standing. *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 544 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). To make this showing, a plaintiff "cannot rely on general or conclusory allegations in support of its standing." *Glennborough Homeowners Ass'n v. USPS*, 21 F.4th 410, 414 (6th Cir. 2021).

**A.**

We begin with a few preliminary matters. *First*, Circular Board challenges Roberts's two-contract theory. To recap, the complaint alleges that Progressive and Circular Board's grant program "comprised two, sequential contractual agreements"—an application-stage contract for those who applied to participate in the program and a grant-stage contract for grant recipients. R. 32, PageID 262. Circular Board argues that there is no application-stage contract. But this argument goes to the merits of Roberts's § 1981 claim. *See Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743, 755 (6th Cir. 2023). "A merits defect deprives a court of subject matter jurisdiction only if the claim is utterly frivolous." *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). Because the complaint's allegations that the grant program involved two contracts are not "utterly frivolous," *see id.*, we accept them as true at this stage in the litigation, *Carrier Corp.*, 673 F.3d at 440.

*Second*, we assume that Roberts has pleaded sufficiently an injury in fact for the application-stage contract. The injury in question, as alleged in the complaint and argued on appeal, is that Roberts could not enter into—and obtain the benefits conferred by—the application-stage contract.

*Third*, Roberts concedes that the complaint does not allege an injury in fact for the grant-stage contract. Thus, Roberts must establish standing for the application-stage contract to proceed in this litigation.

**B.**

Roberts argues that he suffered an injury in fact because he was unable to enter into the application-stage contract with Progressive and Circular Board, and he further argues that the race-based criteria in Progressive and Circular Board's grant program is to blame. The question is whether Roberts's alleged application-stage injury is attributable to Progressive and Circular Board. It is not.

To establish standing at the pleading stage, a plaintiff's complaint must show causation. This requires the plaintiff to allege an "injury fairly traceable to the defendant's allegedly unlawful conduct." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quotation omitted). For a plaintiff to fairly trace his alleged injury to the defendant, "there must be a causal connection between the injury and the conduct complained of." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quotation omitted). In other words, the plaintiff must show that the defendant likely caused his injury. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025). The burden of showing causation is "relatively modest" at the pleading stage. *Bennett v. Spear*, 520 U.S. 154, 171 (1997).

Roberts asserts that he was injured because he was denied the ability to enter into the application-stage contract with Progressive and Circular Board. But Progressive and Circular Board did not cause Roberts's injuries. Roberts caused them. Recall that Roberts closed the grant application without submitting it. Had Roberts submitted his application, he would have formed the application-stage contract with Progressive and Circular Board. And he could have competed for the second contract. At that point, he may have been subjected to racial

discrimination related to his pursuit of a second contract (the grant-stage contract), but that is not the injury at issue here. Because Roberts chose not to take that first step (finishing and submitting the application), he cannot connect his application-stage injury to Progressive and Circular Board's allegedly discriminatory actions.

Roberts's injuries are self-inflicted. A self-inflicted injury generally fails the causation prong of the standing analysis. *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020). This occurs "when an injury is so completely due to the plaintiff's own fault as to break the causal chain." *Id.* (citation modified). "[I]f the plaintiff caused his own injury, he cannot draw a connection between that injury and the defendant's challenged conduct," because the injury "is not traceable to anyone but the plaintiff." *Id.* To put it bluntly, "a person cannot manufacture a case or controversy by acting of their own accord and then blaming someone else for the fallout." *Savel v. MetroHealth Sys.*, 96 F.4th 932, 940 (6th Cir. 2024). In the complaint, Roberts admits that he chose not to submit an application for a grant.

Our caselaw proves the point. In *Buchholz*, a debtor sued his debt collector under the Fair Debt Collection Practices Act claiming that the debt collector's collection efforts caused him anxiety. 946 F.3d at 859. We concluded that the debtor lacked standing because his alleged injuries were caused by his failure to pay his bills, not by the debt collector. *Id.* at 867; *see also Garland v. Orlans, PC*, 999 F.3d 432, 440–41 (6th Cir. 2021) (same). In *Savel*, numerous current and former employees of a hospital brought religious-discrimination claims related to the hospital's COVID-19 vaccine mandate for its employees. 96 F.4th at 937. We held that employees who submitted religious-exemption requests but resigned before the hospital denied the requests lacked standing to sue the hospital. *Id.* at 941.

Roberts's response: *Buchholz* and *Garland*'s rationale is no longer good law after *FEC v. Ted Cruz for Senate*, 596 U.S. 289 (2022). But that argument does nothing to thwart *Savel*'s similar rationale. We decided *Savel* after *Cruz*. Furthermore, *Cruz* is distinguishable.

In *Cruz*, Senator Ted Cruz and his campaign intentionally violated laws restricting political candidates' ability to use post-election contributions to repay personal loans to their

campaigns.  596 U.S. at 293, 295–96.  The government argued that because Cruz caused his own injuries by knowingly violating the law, he lacked standing.  *Id.* at 296.

The Supreme Court disagreed.  It held that Cruz and his campaign satisfied Article III's causation requirements.  The crucial point was that the government still threatened to enforce the challenged laws.  *Id.* at 297, 302.  The Court thus concluded that "an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred."  *Id.* at 297.  Put another way, that Cruz and his campaign voluntarily "subject[ed] themselves to those provisions does not change the fact that they *are* subject to them."  *Id.*

Roberts chose not to enter the application-stage contract.  And because he never entered the first "sequential contractual agreement[]," R. 32, PageID 262, he never subjected himself to the allegedly discriminatory grant program.  Roberts does not allege that Progressive and Circular Board ever applied, or threatened to apply, the grant's race-based eligibility requirement to him.  *See Cruz*, 596 U.S. at 297.  Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Clapper*, 568 U.S. at 416.  Thus, Roberts's decision not to execute the application-stage contract was "not traceable to anyone but" himself.  *Buchholz*, 946 F.3d at 866; *see also Lujan*, 504 U.S. at 560.

Roberts also argues that the complaint's allegation that he was denied the ability to enter into the application-stage contract because of his race gets him over the hump.  We disagree.  That is nothing but a conclusory allegation that does not help Roberts meet the plausibility standard.  *See Iqbal*, 556 U.S. at 678.  The complaint contains no allegations suggesting that the grant application included a racial-disclosure component.  And Roberts did not allege that the application required him to list his race or the race of his company's owners, or that he had to certify his compliance with the race-based eligibility criteria before clicking "submit."  In fact, the complaint does not even allege that Progressive and Circular Board discouraged white business owners from applying.  On the contrary, Progressive emailed Roberts inviting him to "[a]pply to this fund today."  R. 32 PageID 264.

To boost his conclusory allegations, Roberts points to the terms and conditions for the application-stage contract. But the terms and conditions do him no favors. They only reinforce the complaint's deficiencies, illustrating that there was no race-based barrier preventing Roberts from entering into the application-stage contract.

According to the terms and conditions, Roberts would have entered into the application-stage contract as soon as he submitted his completed application. Once Roberts "complete[d] and submit[ted] [his] application," he would have submitted an "Entry." R. 35-1, PageID 394. And "[b]y submitting an Entry," Roberts would "grant[] [Progressive and Circular Board] a royalty-free . . . license to use" his data. *Id.* at 395. At the same time, Roberts would have obtained the contractual right to have his Entry reviewed by Progressive and Circular Board.[3] Based on that review, Progressive and Circular Board would decide whether the applicant would receive the ultimate grant. If Progressive and Circular Board applied race-based criteria to Roberts's application, it would only hinder his ability to enter into the grant-stage contract, not the initial application-stage contract. The harm Roberts suffers at the application stage is of his own volition.

The dissent invokes the Supreme Court's decisions in *Runyon v. McCrary*, 427 U.S. 160 (1976), and *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), to argue that Roberts has standing. But neither case mentions Article III standing, much less conducts a standing analysis. "[M]erits decisions that do not discuss jurisdiction are not of precedential value on jurisdictional issues." *California v. Texas*, 593 U.S. 659, 704 n.8 (2021) (Alito, J., dissenting); *see also Steel Co.*, 523 U.S. at 89–92. Because *Runyon* and *International Brotherhood of Teamsters* address only the merits of discrimination claims, they have no bearing on whether Roberts has established standing.

Regardless, these cases do not help the dissent to the extent it suggests. In *Runyon* and *International Brotherhood of Teamsters*, the plaintiffs' injuries were not the inability to submit

---

[3]The dissent argues that Progressive and Circular Board could have applied the racial-eligibility criteria at any time. But Roberts does not make this allegation, and the terms and conditions indicate otherwise. Progressive and Circular Board would not review an application until after it was submitted and the application-stage contract was already formed.

an application and enter an applicant pool—the respective injuries were the inability to enroll in certain schools, *Runyon*, 427 U.S. at 172–73, and secure certain jobs, *Int'l Bhd. of Teamsters*, 431 U.S. at 365–66.  The dissent assumes that the injury at issue here is the denial of the ultimate grant.  That is not the case.  According to the complaint and Roberts's own legal theory—the theory by which we must evaluate his standing, *Merck v. Walmart, Inc.*, 114 F.4th 762, 772 (6th Cir. 2024); *see also Steel Co.*, 523 U.S. at 89—the act of submitting an application was not merely a ministerial step that allowed Roberts to progress toward obtaining the grant money, it was the only prerequisite to obtaining the separate application-stage contract he sought, and the inability to enter this contract is his alleged injury.  Submitting the application was no futile gesture, nor was it some "sham, nominally race-neutral stage[]," Dissent at 26; it was precisely how Roberts could have entered into the application-stage contract that he wanted.

Because the complaint fails to clearly allege facts showing that Progressive and Circular Board caused Roberts's injuries, the district court lacked subject-matter jurisdiction.**4**

**IV.**

Roberts also argues that the district court erred by entering judgment in favor of Progressive and Circular Board.  So he asks us to vacate the judgment and order the district court to dismiss the complaint without prejudice for lack of subject-matter jurisdiction.

We find no error in the court's judgment.  For starters, the district court dismissed the complaint for lack of subject-matter jurisdiction.  As for the judgment's preclusive effect, when a court dismisses for lack of subject-matter jurisdiction, it must generally do so without prejudice. *Stanley v. W. Mich. Univ.*, 105 F.4th 856, 866 (6th Cir. 2024).  Although we typically presume that silent judgments are with prejudice, *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 518 (6th Cir. 2006), this presumption does not apply to dismissals for lack of jurisdiction, Fed. R. Civ. P. 41(b).

---

**4**Because Roberts failed to establish causation, we need not consider whether damages would redress his alleged injuries.

The judgment in this case does not specify whether it is with or without prejudice.  We now clarify that it is without prejudice.  *See Richmond v. Mosley*, No. 23-1643, 2024 WL 2862505, at *2 (6th Cir. June 6, 2024).

**V.**

For these reasons, we **AFFIRM** the district court's judgment.

———————————

**DISSENT**

———————————

BOGGS, Circuit Judge, dissenting.  This is an extraordinary case in which the court dismisses straightforward allegations of racial discrimination against white and Asian applicants because the plaintiff refused to "subject[] himself to the alleged[] discrimination[]."  Maj. Op. at 9.  Compounding the problem, the majority arrives at this result by resurrecting a long-abolished "restrictive theory of the pleadings" that the Supreme Court has taken pains to "ward off." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014).

As alleged, Defendants Progressive Insurance and Hello Alice operated a racially discriminatory grant program that excluded otherwise eligible white and Asian applicants solely because of race.  Even under the most race-conscious regimes that the Supreme Court has tolerated in the modern era—including those addressed in *Grutter v. Bollinger*, 539 U.S. 306 (2003) and *Regents of University of California v. Bakke*, 438 U.S. 265 (1978)—this program would have been unlawful under Titles VI and VII of the Civil Rights Act and 42 U.S.C. § 1981. The program clearly discriminated against persons on the basis of race, and the defendants here refused to enter into contracts (the grants) on the basis of race.

After this suit was filed, and after *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), the defendants officially discontinued their discriminatory grant program, and have indicated no desire or willingness to reinstitute it, thus mooting the case for future relief.  The plaintiff's damages claim for past discrimination, however, remains available.  Indeed, at the complaint stage, he pleaded facts satisfying every requirement of Article III standing in this context: his status as a person covered by § 1981; a racial exclusion in the grant's terms (reproduced in the complaint); his eligibility for the grant and readiness to compete for it but for the racial bar; and a cognizable unequal-footing injury traceable to the defendants' race-based exclusion.  *See Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993); *Runyon v. McCrary*, 427 U.S. 160, 163, 165, 172–73 (1976).  That injury is redressable through at least nominal damages, which the complaint seeks.  *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021).

The majority opinion, however, treats the plaintiff, Nathan Roberts, as having been too clever by half in articulating a two-stage contractual theory to explain the alleged discrimination, and thus as having pleaded himself out of court.  Specifically, the majority takes Roberts's legal characterization in his complaint—that he was "denied the ability to enter into" the first "contract" because of his race—and turns it into a substantive limit on § 1981 itself.  *See* First Am. Compl. ¶ 32, *Roberts v. Progressive*, No. 1:23-cv-01597, ECF No. 32 (N.D. Ohio filed Jan. 3, 2024).  First, the majority "assume[s] that Roberts has pleaded sufficiently an injury in fact for the application-stage contract."  Maj. Op. at 7.  Then, the court narrowly defines that injury as "deni[al] of the ability to enter into" the contract because, in its view, that is how *Roberts himself* characterizes his legal theory of injury.  *See ibid.* ("Roberts asserts that he was injured because he was denied the ability to enter into the application-stage contract . . . .").  The court thus concludes that "Roberts caused [his own injury by]  . . . clos[ing] the grant application without submitting it."  *Ibid.*

This reasoning does not withstand the slightest scrutiny.  First, whatever the plaintiff's precise legal phrasing, the injury in § 1981 discrimination cases is not, as the majority suggests, mere denial of the submission of a form, but unequal footing in any aspect of the sought-after contractual relationship.  *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 302 (1994).  Given the facts in Roberts's complaint, the majority cannot (and does not) seriously contend that Roberts was on equal footing in his opportunity to compete for a race-restricted grant.  Because, as alleged, that opportunity was the very purpose of the first contract and an essential part of its consideration, any notion that the first contract is race neutral in any meaningful sense is simply untenable.  *See* Maj. Op. at 7–8 (assuming that Roberts "may have been subjected to racial discrimination related to his pursuit of a second contract . . . ."); First Am. Compl. ¶ 32 (characterizing the first contract as an opportunity to compete for the second contract).  Therefore, even accepting the two-contract framing, a § 1981 violation occurred in connection with the first contract.

Second, because the relevant injury is unequal contracting opportunity based on race, the majority's description of that injury as "self-inflicted" is an oxymoron.  *See* Maj. Op. at 8.  Likewise, because the majority necessarily concedes the existence of a racial barrier to

contracting when it assumes an Article III injury, *id.* at 7, it cannot, under black-letter standing doctrine, penalize Roberts for not completing the futile gesture of applying to a competition that members of his race could not win. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U. S. 324, 365–66 (1977) (explaining that a person who is deterred from applying due to a discriminatory policy "is as much a victim of discrimination as is he who goes through the motions of submitting an application."). The self-injury framing therefore makes sense only if the court reduces the competition contract to nothing more than the right to submit a form, nominally open to all applicants alike. That move necessarily recharacterizes the injury as a self-inflicted failure to apply—something that § 1981 has never treated as the relevant injury and that is impossible to square with the majority's own assumption that Roberts suffered a race-based denial-of-entry injury. In other words, the court permits its narrow reading of the plaintiff's legal characterizations in his complaint, rather than his pleaded facts, to dictate the limits of § 1981 and Article III.

That the majority has defined the injury out of existence is particularly evident when it asserts that Roberts "may have been subjected to racial discrimination related to his pursuit of [the grant], but that is not the injury at issue here." Maj. Op. at 7–8. But of course it is. Remarkably, that statement assumes the existence of unequal footing in the first (competition) contract and treats it as legally irrelevant, even though unequal footing *is* the injury in competition-based discrimination cases. *See, e.g., Associated General Contractors*, 508 U.S. at 666.[1] Allowing a complaint's legal model to defeat Article III standing where the pleaded facts otherwise clearly establish standing contravenes our obligation to conduct an independent inquiry into standing, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006), and the settled principle that courts may not decline jurisdiction where it exists, *see Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013).

---

[1]This concession is unsurprising considering that the grant competition's Terms & Conditions, which Hello Alice attached to its motion to dismiss, gives the defendants unfettered discretion to racially disqualify white applicants. *See* Terms & Conditions, R. 35-1, PID 394–96 (reserving "sole discretion" to verify eligibility with documentation or an interview, to request additional information from any entrant, and to disqualify any "ineligible" applicant).

Under the majority's approach, moreover, Roberts's careful pleading becomes a liability: by articulating a legal theory with precision, a plaintiff risks having that explanation used as a basis for dismissal. That result is contrary to the Supreme Court's repeated instruction that pleading sufficiency turns on the facts alleged, not on the legal theories used to describe them. *Johnson*, 574 U.S. at 12; *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

I therefore dissent, both on doctrinal grounds and because the majority's strained reasoning would distort pleading standards and the jurisdictional inquiry in cases far less unusual than this one.

I

To begin with, examine what kind of relationship existed, or potentially existed, between the plaintiff and the defendants. As set forth above by the majority and perhaps recharacterized a bit, the defendants announced to the world a grant program limited to certain types of trucking enterprises, with the further limitation that grants would be awarded only to companies owned by certain minority groups, which would clearly exclude the plaintiff's company. The program stated that, if one applied for such a grant, the applicant's information would be kept on file; the defendants would be able to solicit the applicant with offers for some of their services and products; and the applicant would be considered for a grant if otherwise eligible. The plaintiff alleges that he met all conditions of eligibility (size, not being a certain type of company, etc.), except that the company was owned by a white man. The plaintiff has chosen to characterize this arrangement as involving two contracts: first, an offer to the world of a contract to provide the applicant with certain advertisements (some might consider this a detriment, not a benefit!) and an opportunity to compete for the grant in exchange for his providing Progressive with certain information; and second, a later contract that governed the receipt of the grant itself.

It is not perfectly clear why the plaintiff drew this distinction. His decision, however, appears to stem from a misguided reading of our holding in *Aiken v. Hackett*, 281 F.3d 516 (6th Cir. 2002). Some (including the district court and defendant Progressive) have incorrectly taken *Aiken* to mean that a plaintiff seeking damages due to his racial exclusion from some benefit— such as a grant, contract, or admission slot—must plead that he would have received the benefit.

Thus, as a litigation backstop, Roberts alleged injury at both stages of the process—the competition for the grant and the grant award itself—so that if *Aiken* foreclosed relief for the latter, his claim based on unequal footing in the competition would remain. *See* Oral Arg. Tr. at 12:19 (plaintiff's counsel explaining this approach); First Am. Compl. ¶ 32.

However, *Aiken* never imposed such a pleading hurdle. In that case, white applicants for fire department promotions sought retrospective relief after Black applicants received race-based increases to their composite scores, elevating them on the ranking list used to determine promotions and displacing white applicants who otherwise would have ranked above the cutoff. *Id*. at 518. However, at summary judgement, it was "beyond debate" that the particular plaintiffs had scored so low that they could not have been selected for the positions they sought even under a race-neutral system. *Id.* at 519. Thus, *Aiken* does not require applicants to affirmatively prove, much less plead, that they would have received the benefit absent discrimination; rather, it confirms that a defendant may prevail at summary judgment by definitively showing either that the plaintiff was denied the benefit for some race-neutral reason, or that the plaintiff, like those in *Aiken*, failed to satisfy race-neutral eligibility requirements and therefore never entered the zone of consideration.

It certainly does not follow that a plaintiff seeking retrospective relief must, at the earlier pleading stage, apart from alleging baseline eligibility, also allege that he would have obtained the benefit. First, in discrimination cases, the burden rests on the *defendant* to come forward with proof that the same decision would have been made anyway, *Texas v. Lesage*, 528 U.S. 18, 20–21 (1999), and plaintiffs are not required to anticipate and negate each defense in their complaints, *Memphis, Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). Second, because that same-decision inquiry may turn on facts about internal decision-making processes obtainable only through discovery, it is often resolved, if at all, on a developed record at summary judgment. *See Lesage*, 528 U.S. at 19–20. Third, if plaintiffs had to plead (and effectively prove at the outset) that they would have won the competition, a large swathe of past discriminatory decisions would be functionally immunized from judicial review. Not surprisingly, then, the Supreme Court has characterized

the same-decision principle as a *liability* defense, not an Article III pleading requirement. *Lesage*, 528 U.S. at 20–21.

Moreover, where, as here, the plaintiff seeks nominal damages for the denial of equal footing itself, on-point Supreme Court precedent already establishes the correct pleading standard. The Court has made clear that a violation of one's right to racially equal footing in a competitive process constitutes a concrete Article III injury, and that nominal damages suffice to redress it even without proof of economic loss. *See Uzuegbunam*, 592 U.S. at 293; *Associated General Contractors,* 508 U.S. at 666. Thus, even if Progressive could later prove that Roberts, though eligible, would not have received the ultimate award on race-neutral criteria, that showing would only defeat compensatory damages for the lost prize. It would not affect the plaintiff's ability to plead and pursue at least nominal damages for having been subjected to unequal terms of competition.

II

In any event, Roberts did choose to advance a two-contract theory. However, on any reasonable interpretation—let alone one in the light most favorable to Roberts, which he is entitled to—Roberts has standing here, as would plaintiffs in ordinary discrimination cases, or seminal ones.

In my colloquy with counsel at oral argument, I noted that in *Runyon v. McCrary*, 427 U.S. 160 (1976), the seminal § 1981 case, there was no sign that the minority plaintiffs who wished to have their children accepted to a whites-only school and were refused admission had been required to show that they would have been accepted, or even that they had gone through some type of specific application process. In fact, as shown by the record and the opinions in those cases, the mother of applicant McCrary had merely inquired about application to the school, had learned that her child met all the race-neutral criteria, and had been told that only white applicants could be accepted—facts that that the *Runyon* court deemed "ample" to prevail on a § 1981 discrimination claim at trial and that are materially identical to those pleaded by the plaintiff in our case. *Compare Runyon*, 427 U.S. at 165, 172–73 *and* Complaint ¶ 6(a),

*Runyon v. McCrary*, 427 U.S. 160, App. at 94 (1976) *with* First Am. Compl. ¶¶ 27–31, *Roberts v. Progressive*, No. 1:23-cv-01597, ECF No. 32 (N.D. Ohio filed Jan. 3, 2024).

The very learned counsel for plaintiffs shot back with a rather interesting response that had not occurred to me: he stated that *Runyon* had been in a "pre-*Iqbal* and *Twombly*" posture, and, implicitly, that Mrs. McCrary would have been thrown out of court today for failure to raise her injuries above the level of speculative. *See* Oral Arg. Tr. at 18:35–18:45. While I found this immediate response intriguing, I found it very unlikely that this seminal civil-rights case would have collapsed at its inception had it been brought today for the first time. That is not because pleading standards were once more forgiving, but because the complaint there alleged a concrete fact of racial exclusion: the parent was told her otherwise eligible child "was unacceptable for enrollment because of his race," Complaint ¶ 6(a), *Runyon v. McCrary*, 427 U.S. 160, App. at 94 (1976), just as it is perfectly clear here that an otherwise eligible white applicant would not have been awarded a grant because, by the grant's very terms, his race blocked him from equal consideration, First Am. Compl. ¶ 18. A factual allegation of categorical racial ineligibility or unequal footing is not speculative under any modern pleading regime; it states a completed denial of equal consideration.

So we turn to the initial, or "application-contract" stage, where the defendants now say that Roberts's application would have been welcome, and only then would have been tossed aside for a grant because of his race. This notion strains credulity based on both the racially exclusionary solicitation material sent by the defendants and the statements made in the complaint, especially when taken, as they must be, in the light most favorable to Roberts. Moreover, Roberts's two-contract legal model has no bearing on whether the underlying facts are sufficient to state a claim.

III

The majority holds to the contrary, maintaining that Nathan Roberts, a white business-owner, injured himself by failing to click "submit" on a grant application whose eligibility criteria categorically excluded him by race. There are many problems with this argument, but we can start with Supreme Court precedent. It is well-established that a facially discriminatory

policy inflicts injury when, as here, it deters a ready, able, and willing applicant from applying for a benefit.  *See, e.g.*, *Int'l Bhd. of Teamsters*, 431 U.S. at 365–67 (holding, in the context of a Title VII suit for racially discriminatory hiring, that otherwise eligible and willing applicants challenging discriminatory hiring practices need not apply for positions where a facially or *de facto* discriminatory policy would render application futile, because deterrence itself constitutes actionable discriminatory injury).  The Court has also held repeatedly that once a prospective applicant incurs an unequal-footing injury, there is no need for him to apply or make other futile gestures to create standing or to prove the injury already sustained.  *See Runyon*, 427 U.S. at 172–73.**[2]**

The majority counters that cases such as *Teamsters* and *Runyon*, which only discuss the merits of discrimination claims, "have no bearing" on standing, Maj. Op. at 10.  *But s*ee *Carney v. Adams,* 592 U.S. 53, 66 (2020) (citing *Int'l Bhd. of Teamsters*, 431 U.S. at 365–66) (applying the futile-gesture doctrine set forth in *Teamsters* to the standing analysis); *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) ("[S]tanding should be seen as a question of substantive law, answerable by reference to the statutory . . . provision whose protection is invoked.") (cleaned up).

Here, we have a clear-cut instance of unequal footing and discriminatory deterrence: no one would compete for a prize reserved for someone else's race.  The majority's main defense is its attempt to redefine that prize as the opportunity to click "submit" and partake in a hollow ritual of application review that ends in exclusion.  In this framing, only one race can win, but all were equally free to go through the motions of competing.  But as I explain below, this distorts the plaintiff's pleadings, despite the Supreme Court's express admonitions against doing so.  Through this distortion, today's decision recasts a straightforward injury under 42 U.S.C. § 1981 as self-inflicted, in defiance of binding precedent and common sense.

---

**[2]***See also Int'l Bhd. of Teamsters*, 431 U.S. at 365–66; *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (recognizing that a contractor need not actually submit a bid to allege injury; it is enough to show that it is "able and ready to bid" and that a discriminatory policy prevents it from competing on equal footing); *Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003) (rejecting the argument that the applicant-plaintiff's injury was "conjectural or hypothetical" because she did not "actually apply for admission" to the University of Michigan as a transfer student) (internal alteration omitted).

A

Consider first *Runyon v. McCrary*, 427 U.S. 160 (1976), the seminal § 1981 case.  The parents of minority schoolchildren alleged that the schools that their children wished to attend illegally discriminated based on race.  *Id.* at 163.  The named plaintiff, Mrs. McCrary, did not fill out an application or tender tuition to either school at issue; she only telephoned one of the schools to ask if it was integrated, and "[t]he answer was no."  *Ibid.*  The Supreme Court held that the race-based refusal itself was a "classic violation" of § 1981, which protects the right to make contracts, free of racial discrimination.  The Court affirmed the district court's finding of "ample evidence" of discrimination.  *Id.* at 172–73.  As the district court explained, "[i]t is of no moment that no formal application was filed.  It would be ridiculous to require this of the plaintiffs after they had effectively been told it was useless."  *Gonzales v. Fairfax-Brewster Sch., Inc.*, 363 F. Supp. 1200, 1203 (E.D. Va. 1973).  That reasoning squarely rejects the very argument the majority advances here.

In fact, *Runyon* alone is sufficient to establish Roberts's standing.  In his complaint, Roberts attached both the email invitation to apply and the grant's terms and conditions, each expressly limiting eligibility by race.  First Am. Compl. ¶¶ 12, 13, 18.  The terms sent to Roberts announced that a business applicant had to be at least 51% "owned and operated by . . . Black-identifying" individuals "to be eligible for this opportunity."  *Id.* at ¶ 18.  And he "came to a part of the application that made clear that the grants were available only to black-owned businesses."  First Am. Compl. ¶ 27.  The majority does not dispute—or assumes *arguendo*—that Roberts adequately alleged he met every eligibility criterion for the grant except race,[3] and that he abandoned the application process only because the racial barrier made further participation futile.  *Id*. at. ¶¶ 27–32.  Hence, he alleges concrete and particularized facts that parallel *Runyon* exactly, but in modern technology: an invitation to apply for a benefit (an advertisement for a

---

[3]It is worth noting that under the majority's logic, discussed *infra*, Roberts would not even be required to plead that he met the grant criteria.  The majority says that Roberts only wanted the first contract, which in its telling was supposedly a mere formality open to anyone with the ability to press "submit."  Maj. Op. at 10.  Any hurdles to entering such a contract could only exist through the mechanics of the form itself (e.g. a racial checkbox or certification). *Id.* at 9.  So, the eligibility hurdles for the *second* contract—the grant—are beside the point.  The majority could not demand proof of eligibility for a process that, according to its account, was open to all.

private school in *Runyon*,[4] an email for a grant in *Roberts*), followed by the applicant's attempt to pursue that opportunity (a phone inquiry there, partial form completion here), and, finally, an explicit racial exclusion that deterred the applicant from submitting a futile application (a verbal statement there, written terms and email correspondence here). That should be the end of this case.[5]

B

Instead, to argue that submission of an application would not have been futile, the majority claims that any racially discriminatory terms exist only in the later, grant-stage contract, which also happens to be the contract that, according to the majority, Roberts has conceded he lacks standing to litigate. By contrast, the initial contract—the one that the majority says Roberts *does* challenge—is supposedly a bare procedural shell and therefore gives him no rights that this court is bound to respect. In the majority's view, all that Roberts bargained for in the initial contract was the right to enter the competition—to click the button that would place his submission into the hopper, even if it would then be discarded on racial grounds. Because this "opportunity" was open to everyone on a nondiscriminatory basis, and because Roberts refused to avail himself of it, the majority contends that he has only himself to blame.

This argument suffers from several fatal flaws. Even accepting the majority's premise that Roberts could have entered the first contract because it was purely ministerial, its ministerial nature would itself inflict injury under *International Brotherhood of Teamsters*, 431 U.S. at 365–67. A contract to participate in a competition one cannot win because of race contains an obvious forbidden racial deterrent. No rational applicant would enter an agreement that, for

---

[4]*Runyon*, 427 U.S. at 165.

[5]The majority is correct that *Runyon* was a merits decision that did not separately analyze Article III standing, and "drive-by jurisdictional rulings . . . have no precedential effect." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (collecting cases). But in *Runyon*, the facts necessary to win on the merits, if adequately alleged in a complaint, would also establish standing at the pleading stage. The court framed the merits issue as "whether [Section] 1981, prohibits private schools from excluding qualified children solely because they are Negroes." *Runyon*, 427 U.S. at 163; *see also McCrary v. Runyon*, 515 F.2d 1082, 1087 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976) ("1981 prohibits the rejection of a black applicant when his qualifications meet all other requirements and race is the only basis for his rejection."). That framing, together with the damages award in the case, unmistakably implicates all the Article III ingredients: baseline eligibility ("qualified children"), injury, causation, and redressability.

members of his race, is nothing more than a sham.  Because *Teamsters* makes clear that such a forbidden deterrent inflicts discriminatory injury, it, like *Runyon*, should easily settle this case.

C

At the motion-to-dismiss stage, the court is supposed to credit facts showing a plausible entitlement to relief—nothing more.  Federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson,* 574 U.S. at 11.[6]  Theories of standing are no exception.  *See Robertson v. Allied Sols., LLC*, 902 F.3d 690, 695 (7th Cir. 2018) ("Complaints need not delineate every detail of the plaintiff's legal theory [of injury].  Because Robertson pleaded facts showing a plausible [Article III] injury, she receives the benefit of imagination . . . ." ) (cleaned up); *In re SuperValu, Inc.*, 870 F.3d 763, 772 (8th Cir. 2017) (applying *Johnson* to reach a similar conclusion about standing).  Yet the majority spends much time tangled in Roberts's (admittedly unconventional) two-contract legal theory and misses the most obvious and salient point: that the *facts* are on par with *Runyon* and make out a classic § 1981 claim.

When the majority declares that "Roberts must establish standing for the application-stage contract to proceed in this litigation," Maj. Op. at 7, it sets up the wrong question.  Roberts need only allege facts that make standing plausible under § 1981—as he clearly does—regardless of how he theorizes that claim.  There is no requirement of a separate showing that each contract theory can "proceed" in isolation when the pleaded facts plausibly establish a single cognizable § 1981 injury.  *See Dibrell v. City of Knoxville, Tennessee*, 984 F.3d 1156, 1160 (6th Cir. 2021) (explaining that the "complaint did not need to expressly plead legal theories; it needed to plead factual allegations that impliedly established at least one viable

---

[6]*See also Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("Skinner's complaint is not a model of the careful drafter's art, but under the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."); *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) ("particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not."); *Yakubek v. Rex*, 963 F.2d 374 (6th Cir. 1992) ("Federal pleading is by statement of claim, not by legal theory.") (cleaned up); *Pollis v. Bd. of Chosen Freeholders of Cnty. of Sussex, N.J.*, 523 F. App'x 187, 189 (3d Cir. 2013) (similar); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 220–27 (3d ed. 2004) (explaining that a complaint need only set forth "direct allegations on every material point necessary to sustain a recovery on any recognizable legal theory, *even though that theory may not be the one suggested or intended by the pleader*.") (emphasis added).

theory."). Especially "when an action implicates a civil rights interest," we "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Gowen v. Winfield*, 130 F.4th 162, 171 (4th Cir. 2025) (citation omitted); *see also Thurmond v. Cnty. of Wayne*, 447 F. App'x 643, 653 (6th Cir. 2011) ("Dismissals of actions brought under the civil rights statutes are scrutinized with special care."). This is done "in order to effectuate the high congressional priority placed upon the vindication of civil rights deprivations." *Canty v. City of Richmond, Virginia, Police Dep't*, 383 F. Supp. 1396, 1399 (E.D. Va. 1974), *aff'd sub nom. Canty v. Brown*, 526 F.2d 587 (4th Cir. 1975).

Nevertheless, the majority penalizes Roberts for the way that he frames his claim. The majority impermissibly relies on a legal conclusion in his complaint—that "he was denied the opportunity to enter into the application-stage contract . . . because of his race"— to shrink the scope of his § 1981 protections. *See* Maj. Op. at 7; First Am. Compl. ¶ 32. In other words, the majority relies solely on the absence of barriers to submission of a formal application, *id.* at 9, as though that were the beginning and end of the § 1981 analysis. In just the same way, under that view, the discriminatory school in *Runyon* could have prevailed because Mrs. McCrary did not fill out a form or tender tuition. *See Runyon*, 427 U.S. at 163. But the salient question for § 1981 purposes is whether Roberts was, in *any* way, racially disadvantaged, for the statute prohibits unequal footing in *all* aspects of contracting. *See Rivers,* 511 U.S. at 302 (explaining that the Civil Rights Act of 1991 expressly applies § 1981 to discrimination in "all phases and incidents of the contractual relationship."). Consider in this regard the factual allegation in Roberts's complaint that "he came to a part of the application that made clear that the grants were available only to black-owned businesses." First Am. Compl. ¶ 27. A contract to compete for a race-restricted benefit falls squarely within § 1981's unequal-footing prohibition, not least because the competition is only worth anything to members of the grant-eligible race. As explained in Section III, Part B, *supra* at 22–23, such a "contract" would also be the kind of discriminatory deterrent condemned in *International Brotherhood of Teamsters*, 431 U.S. at 365–67. Moreover, even putting contract theories aside, as we must, the facts are materially identical to those in *Runyon*.

D

Finally, the majority's assumption that race-based criteria operate only at the point of grant receipt cannot be reconciled with its own concessions that Roberts suffered an injury-in-fact in the competition contract and would be on potentially unequal footing during the competition itself. *See* Maj. Op. at 7–8. Moreover, it is a false dichotomy. It is routine for separate contracts to contain overlapping terms or conditions; here, the allegation is that the competition for the grant and the grant itself shared the same racial condition. First Am. Compl. ¶ 32.

The majority's only response is its observation that Progressive invited Roberts to apply and that the application form itself did not include an explicit racial checkbox, question, or certification. Maj. Op. at 9. The argument seems to be that these circumstances, coupled with the fact that racial disqualification might only happen later, *id.* at 10, prove that race played no role in the competition contract. This is meritless. First, like Nathan Roberts, the plaintiffs in *Runyon* received race-neutral advertisements and invitations to apply—a mass mailer and a Yellow Pages ad. And there was no indication that the application form provided to one of the named plaintiffs, Colin Gonzales, mentioned race at all. And yet, the Court still found a § 1981 violation under materially identical facts. *Runyon*, 427 U.S. at 165, 172–73. Second, as already noted, the alleged absence of entry barriers in the application interface is beside the point: § 1981 forbids unequal footing *anywhere* in the contractual relationship, including in the competition itself, and not just in the form mechanics. *Rivers*, 511 U.S. at 298. Third, Roberts *did* plead that "he came to a part of the application that made clear that the grants were available only to black-owned businesses." First Am. Compl. ¶ 27. Whether that statement was contained in a checkbox or written in plain English, it bars the same door. Either one would deter any reasonable white or Asian applicant from submitting the form. *See Int'l Bhd. of Teamsters*, 431 U.S. at 365–67.

Perhaps underlying the majority's position is an assumption that the racial restriction did not attach until Progressive enforced it at the "grant stage." This rests on a factual error: Progressive reserved the right to enforce racial eligibility conditions at *any* point in the competition, which further undermines any suggestion that all applicants were on equal footing

before Progressive provisionally awarded a grant. *See* Terms & Conditions, R. 35-1, PID 394–96 (reserving the right to disqualify any entry during the review stage that, "as adjudged in [Progressive's] determination," was ineligible on account of race or other listed criteria, and to request additional materials or an interview relating to eligibility). Second, this belief defies common sense: legal conditions govern before they are enforced. Homer Plessy bought a ticket and sat in a whites-only coach before a conductor and police officer "forcibly ejected" him under Louisiana's segregation law. *Plessy v. Ferguson*, 163 U.S. 537, 541–42 (1896). By the majority's logic, state law did not govern that transaction until the police arrived—as if, at the "ticket stage," all was equal.

More fundamentally, the majority's attempt to sanitize the first contract defies a basic principle of anti-discrimination law. Regardless of whether Nathan Roberts alleged two contractual stages or many, § 1981 does not permit discriminators to launder their discrimination through a series of sham, nominally race-neutral stages.

IV

At the pleading stage, we are supposed to take facts in the light most favorable to the plaintiff and set aside his legal theories, not take his legal theories in the light least favorable to him and set aside the facts. That inversion conflicts not only with common sense but with the Supreme Court's own binding precedents. *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014), reminds us that plaintiffs need only a "short and plain statement" showing entitlement to relief, and that "legal theories" are not a prerequisite to having standing at the pleading stage. Only by ignoring this guidance can the majority justify ignoring *Runyon v. McCrary*, 427 U.S. 160 (1976), which involved facts substantially similar to those Roberts pleads. Indeed, that omission disregards the settled principle that an (otherwise ready and qualified) applicant need not perform the futile act of applying under a facially discriminatory policy to acquire standing. *See* n.2, *supra* (collecting cases). I therefore respectfully dissent from the court's legitimation of a discriminatory policy through a heightened pleading standard that faults the plaintiff's framing rather than addresses his facts.